1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    TERRY SHARP,                              No.  2:24-cv-2866 WBS CSK P

12                    Plaintiff,

13         v.                                   FINDINGS AND RECOMMENDATIONS

14    DEPUTY SMITH, et al.,

15                    Defendants.

16

17    **I.  INTRODUCTION**

18          Plaintiff is a former county prisoner, proceeding without counsel, with a civil rights action

19    pursuant to 42 U.S.C. § 1983.  On November 5, 2024, this Court dismissed plaintiff's complaint

20    with leave to amend.  (ECF No. 4.)  On November 6, 2024, plaintiff filed an amended complaint.

21    (ECF No. 5.)  On December 4, 2024, plaintiff filed a second amended complaint.  (ECF No. 8.)

22    Good cause appearing, this Court screens plaintiff's second amended complaint.  Fed R. Civ. P.

23    15(a).

24    **II.  SCREENING STANDARDS**

25          A claim is legally frivolous when it lacks an arguable basis either in law or in fact.

26    Neitzke v. Williams, 490 U.S. 319, 325 (1989); Franklin v. Murphy, 745 F.2d 1221, 1227-28 (9th

27    Cir. 1984).  The court may, therefore, dismiss a claim as frivolous when it is based on an

28    indisputably meritless legal theory or where the factual contentions are clearly baseless.  Neitzke,

1

1   490 U.S. at 327.  The critical inquiry is whether a constitutional claim, however inartfully

2   pleaded, has an arguable legal and factual basis.  See Jackson v. Arizona, 885 F.2d 639, 640 (9th

3   Cir. 1989), superseded by statute as stated in Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir.

4   2000) ("[A] judge may dismiss [in forma pauperis] claims which are based on indisputably

5   meritless legal theories or whose factual contentions are clearly baseless."); Franklin, 745 F.2d at

6   1227.

7          Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain

8   statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

9   defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic

10  Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

11  In order to survive dismissal for failure to state a claim, a complaint must contain more than "a

12  formulaic recitation of the elements of a cause of action;" it must contain factual allegations

13  sufficient "to raise a right to relief above the speculative level."  Bell Atlantic, 550 U.S. at 555.

14  However, "[s]pecific facts are not necessary; the statement [of facts] need only 'give the

15  defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v.

16  Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic, 550 U.S. at 555, citations and internal

17  quotations marks omitted).  In reviewing a complaint under this standard, the court must accept as

18  true the allegations of the complaint in question, Erickson, 551 U.S. at 93, and construe the

19  pleading in the light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236

20  (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984).

21  **III.  SECOND AMENDED COMPLAINT**

22          Named as defendants are Sacramento County, Dr. Kim, Dr. Masood, Nurse Gomez, Nurse

23  Glaser, Nurse Muring, Nurse Kaur, Nurse Ballesteros, Nurse Hailey-Currey, Nurse Mossett and

24  Nurse Akudinobi.  (ECF No. 8 at 2-3.)  Plaintiff also identifies 15 doe defendants who plaintiff

25  identifies by name:  Deputy Smith (doe 1), Sergeant Mazzanti (doe 2), Deputy Cervetti (doe 3),

26  Deputy Yang (doe 4), Deputy Mora (doe 5), Deputy Cervantes (doe 6), Deputy Her (doe 7),

27  Deputy Copenhaver (doe 8), Deputy Gill (doe 9), Deputy Barrera (doe 10), Deputy Dhaliwal (doe

28  11), Nurse Melissa (doe 12), Nurse Tracy (doe 13), Nurse Reema (doe 14) and Gladys (doe 15).

1    (Id. at 2-3.)  Also named as a defendant is Nurse Zaragoza.  (Id. at 8.)  The alleged deprivations

2    occurred at the Sacramento County Main Jail ("Main Jail") and the Rio Consumnes Correctional

3    Center ("RCCC").

4         Plaintiff's second amended complaint raises the following legal claims: 1) alleged

5    violation of plaintiff's constitutional right to adequate medical care (claims one, three, five, six);

6    2) alleged violation of the Americans with Disabilities Act ("ADA") (claims two, nine);

7    3) alleged violation of plaintiff's right to communicate (claim four); 4) retaliation (claims six,

8    eight); and 5) alleged violation of plaintiff's right to exercise (claim seven).  (Id. at 40-49.)  As

9    relief, plaintiff seeks money damages.  (Id. at 49.)

10        Plaintiff appears to have been a pretrial detainee at the time of the alleged deprivations.

11    **A.  Claims Alleging Inadequate Medical Care: Claims One, Three, Five and Six**

12         1.  Legal Standards

13              *a.  Legal Standard for Claim Alleging Inadequate Medical Care*

14        A claim for a violation of a pretrial detainee's right to adequate medical care arises under

15    the Fourteenth Amendment rather than the Eighth Amendment.  See Gordon v. County of

16    Orange, 888 F.3d 1118, 1122, 1125 n.4 (9th Cir. 2018).  The claim is evaluated under an

17    objective deliberate indifference standard.

18              [T]he elements of a pretrial detainee's medical care claim against an
               individual defendant under the due process clause of the Fourteenth
19             Amendment are: (i) the defendant made an intentional decision with
               respect to the conditions under which the plaintiff was confined;
20             (ii) those conditions put the plaintiff at substantial risk of suffering
               serious harm; (iii) the defendant did not take reasonable available
21             measures to abate that risk, even though a reasonable official in the
               circumstances would have appreciated the high degree of risk
22             involved—making the consequences of the defendant's conduct
               obvious; and (iv) by not taking such measures, the defendant caused
23             the plaintiff's injuries.

24    Id. at 1125.

25        For the third element, the defendant's conduct must be objectively unreasonable, "a test

26    that will necessarily turn[ ] on the facts and circumstances of each particular case."  Id. (citations

27    and internal quotation marks omitted).  The four-part test articulated in Gordon requires the

28    plaintiff to prove more than negligence, but less than subjective intent– something akin to

1   reckless disregard.  See id.

2                 *b. Legal Standard for Municipal Liability*

3       Municipalities cannot be held vicariously liable under Section 1983 for the actions of their

4   employees.  See Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978).  "Instead, it is

5   when execution of a government's policy or custom, whether made by its lawmakers or by those

6   whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

7   government as an entity is responsible under § 1983."  Id.  To properly plead a Monell claim

8   based on an unconstitutional custom, practice, or policy, plaintiff must demonstrate that 1) he

9   possessed a constitutional right of which he was deprived; 2) the municipality had a policy;

10   3) such policy amounts to deliberate indifference to plaintiff's constitutional right; and 4) the

11   policy is the moving force behind the constitutional violation.  See Plumeau v. Sch. Dist. No. 40

12   County. of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

13          2.  Claim One: Alleged Denial of Adequate Medical Care Against Defendants

14                   Sacramento County, Kim and Gomez

15              *a. Allegations Made in Support of Claim One*

16       This Court first sets forth the allegations in the second amended complaint on which claim

17   one appears to be based.  Plaintiff alleges that he was arrested and booked into the Main Jail on

18   October 17, 2022 and released on January 4, 2024.  (Id. at 4.)  On October 11, 2022, plaintiff was

19   shot during an officer involved shooting.  (Id.)  Plaintiff was hospitalized at Kaiser Permanente

20   South Hospital due to the injuries he suffered during the October 11, 2022 incident.  (Id.)

21   Plaintiff was released from the hospital to the Main Jail on October 17, 2022.  (Id.)

22       The staff at Kaiser Permanente South Hospital documented plaintiff's injuries as

23   1) traumatic hemothorax; 2) traumatic pneumothorax; 3) right single rib fracture; 4) C5 vertebral

24   fx; 5) C6 vertebral fx; 6) T2 vertebral fx; 7) T3 vertebral fx; 8) gunshot wound of thorax;

25   9) gunshot wound of neck; 10) unilat lung contusion; and 11) right ear abrasion.  (Id. at 5.)

26   Plaintiff also had musculoskeletal impairment limiting the mobility in plaintiff's neck, back,

27   shoulder and arms.  (Id.)  Plaintiff's injuries from multiple gunshot wounds were in his right

28   trapezius area, his neck, his upper arm, his right rib cage and right forearm.  (Id. at 5-6.)

1    When plaintiff discharged from Kaiser Permanente South Hospital, the discharge orders

2    regarding wound care were: 1) Injury: right trapezius wound.  Treatment: dry gauze dressing

3    BID; 2) Injury: left supraclavicular/neck wound.  Treatment: dry gauze dressing BID; 3) Injury:

4    right upper arm wounds (2 medial, 2 lateral).  Treatment: Twice daily wet to dry packing; and

5    4) Injury: right forearm laceration.  Treatment: gauze dressing, keep dry and clean.  (Id. at 6.)

6    Included with the discharge orders regarding wound care were instructions regarding how to

7    properly administer treatment with a visual guide.  (Id.)  The discharge orders regarding

8    plaintiff's housing accommodations included the following: bottom bunk bed, grab bars in

9    holding cell and shower, bottom tier housing, extra mattress, extra blanket and grab bars in cell.

10   (Id.)  The discharge orders regarding Medical Assistive Devices included: 1) Aspen C collar (to

11   be worn at all times for 90 day); 2) extra Aspen collar padding (to maintain sanitary conditions);

12   and 3) Philadelphia C collar (water resistant, for shower use).  (Id. at 7.)  The discharge orders

13   regarding plaintiff's physical activity included the following: 1) wear cervical collar at all times

14   until cleared by healthcare provider; 2) avoid heavy lifting 15-20 pounds, strenuous physical

15   activity or contact sports until cleared by neurosurgeon; 3) walk several times a day, gradually

16   increase the time and distance; 4) patient may shower with cervical collar provided by Kaiser

17   Permanente; and 5) after removing gauze, patient may shower with wounds uncovered, allowing

18   warm water to run over them.  (Id.)

19   Plaintiff alleges that his medical records and aftercare/discharge orders from Kaiser

20   Permanente South Hospital were provided to defendants Gomez and Kim.  (Id. at 8.)  During

21   plaintiff's intake examination, defendant Kim altered the discharge orders from Kaiser

22   Permanente South Hospital by making the following changes: 1) removal of dry dressing gauze

23   order for trapezius wound; 2) removal of dry gauze dressing for supraclavicular wounds;

24   3) reduce 2 wet packing and 2 dry packing daily to 1 wet packing; 4) substitute Norco pain

25   medication for Tramadol; and 5) ordered cervical collar should be worn at all times, preventing

26   wound care for the trapezius and neck wounds.  (Id.)  Plaintiff alleges that defendant Kim made

27   these changes to the discharge orders without allowing a period of observation to determine if the

28   aftercare treatment plan was effective, excessive or ineffective.  (Id.)

5

On October 17, 2022, defendant Zaragoza failed to perform prescribed wound care treatment for plaintiff's neck and trapeziums wounds as a result of defendant Kim's instruction. (Id.) Defendant Zaragoza wrote, "Dr. Kim notified of patient stating he has gunshot wounds under C-collar; order was not to remove C-collar (unable to provide wound care because of this)." (Id. at 8-9.)

Plaintiff told defendant Kim that doctors at Kaiser Permanente South Hospital routinely removed the cervical collar when administering wound care treatment for plaintiff's supraclavicular and trapezius wounds. (Id. at 9.) Defendant Kim explained that he understood that he was expected to remove the cervical collar to perform wound care but had fears that nursing staff might not be trained well enough to handle the delicate task on a daily basis. (Id.) Plaintiff asked about the Philadelphia C-collar prescribed for showering but received no response. (Id.) Defendant Kim told plaintiff that showers would not be allowed due to plaintiff's injury and medical assistive device required for showers. (Id.) Plaintiff was denied showers although plaintiff was capable of walking, showering independently and was self-ambulating. (Id. at 10.) Kaiser Permanente South Hospital advised plaintiff to shower, providing medically related concerns with showering and emphasizing the importance of hygiene. (Id.) Clear instructions detailing how plaintiff was expected to perform showers were included with the aftercare orders provided to defendant Kim from Kaiser Permanente South Hospital. (Id.) Plaintiff told defendant Kim that plaintiff was covered in dry blood, and that this was extremely unsanitary and unhygienic. (Id.)

Sacramento County Jail protocol required defendant Kim to file a "Miscellaneous Medical Needs" form for plaintiff's medical assistive devices. (Id.) A "Miscellaneous Medical Needs" form authorizes an in-custody patient to possess medically required devices, medication, etc. (Id.) Defendant Kim's failure to file the "Miscellaneous Medical Needs" form resulted in the confiscation of plaintiff's Philadelphia C-collar. (Id.) Plaintiff explained that the confiscation of the Philadelphia C-collar would leave plaintiff with no option but to shower with his Aspen C-collar. (Id.) Plaintiff explained the risk of showering with the Aspen-C collar, detailing how exposing the Aspen C-collar to water would result in the padding becoming wet and increasing

6

the risk of infection.  (Id. at 10-11.)  Defendant Kim issued an order prohibiting plaintiff from showering.  (Id. at 11.)  Defendants Kim and Gomez determined that it would be best for plaintiff to take bird baths.  (Id.)  A bird bath is when a person bathes with a rag in a sink or a bucket.  (Id.)  Plaintiff was provided with a bucket, a rag and a jail sink and instructed to fill the bucket in the sink and use the rag to bathe.  (Id.)  Performing the bird bath violated Kaiser Permanente South Hospital's discharge order for plaintiff not to do any heavy lifting or strenuous activity.  (Id.)  Plaintiff made defendants Kim and Gomez aware of plaintiff's inability to perform bird baths for the following reasons: 1) pain in all extremities; 2) inability to lift, bend or stand for long periods of time; 3) limited range of motion in arms; and 4) the sink has limited water pressure and a "fail safe" to operate 5 second per push, causing nerve damage, weakness and numbness in plaintiff's fingers.  (Id. at 11-12.)  Plaintiff informed defendants Kim and Gomez of other risks caused by taking a bird bath: 1) no effective draining system in cell; 2) spilled water created a slip and fall hazard; 3) the bird bath required more labor than a shower; 4) the bird bath required bending over; and 5) the bird bath required stretching which could result in wound tearing and damage to the staple job.  (Id. at 12.)  Plaintiff was denied access to a shower from October 17, 2022 to October 21, 2022.  (Id.)

On October 18, 2022, defendant Kim observed a possible infection on plaintiff and prescribed Doxycycline.  (Id.)  On October 19, 2022, defendant Kim confirmed the suspected infections: "Multiple gunshot wounds to right upper arm and trapezius are draining puss, started on Doxycycline yesterday."  (Id.)  Plaintiff alleges that this infection was caused by the substandard medical care provided by defendant Kim.  (Id.)  On October 19, 2022, defendant Kim further altered plaintiff's aftercare orders as follows: 1) treat arm wounds once per day; and 2) prescribe antibiotics.  (Id. at 13.)  Plaintiff alleges that defendant Kim's orders deviated from the required care by administering less than the recommended daily wound care treatments and by failing to address the trapezius infection.  (Id.)

On October 20, 2022, defendant Ballesteros observed that plaintiff had removed the cervical collar and was standing at his cell door pointing at his neck and requesting wound check on his neck.  (Id.)  After being informed of this incident, defendant Kim authorized nurses to

1    remove plaintiff's C-collar to perform wound care for plaintiff's neck wounds.  (Id.)

2                                    *b. Analysis*

3          In claim one, plaintiff alleges that defendants Kim and Gomez violated plaintiff's

4    Fourteenth Amendment right to adequate medical care by failing to follow the aftercare orders.

5    (Id. at 40.)  This Court finds that plaintiff states a potentially colorable claim against defendant

6    Kim for violating plaintiff's Fourteenth Amendment right to adequate medical care by allegedly

7    1) failing to fill out the "Miscellaneous Medical Needs" form that resulted in the confiscation of

8    plaintiff's Philadelphia collar; 2) denying plaintiff access to showers and instead ordering bird

9    baths; 3) failing to follow the aftercare orders regarding wound care issued by Kaiser Permanente

10   South Hospital.  This Court finds that plaintiff states a potentially colorable Fourteenth

11   Amendment inadequate medical care claim against defendant Gomez based on defendant

12   Gomez's alleged denial of showers to plaintiff and instead providing bird baths.

13         In claim one, plaintiff also alleges that defendant Sacramento County acted as the policy

14   making authority and maintained policies or customs that caused the violation of plaintiff's

15   Fourteenth Amendment rights alleged in claim one.  (Id.)  However, in support of claim one,

16   plaintiff alleges no facts demonstrating that the alleged deprivations occurred as a result of a

17   policy, custom or practice of defendant Sacramento County.  Accordingly, this Court finds that

18   claim one fails to state a potentially colorable Monell claim against defendant Sacramento

19   County.

20         Plaintiff also alleges that defendant Sacramento County is vicariously liable for the

21   actions of its employees pursuant to California Government Code sections 815.2(a), 820(a) and

22   845.6.  (Id. at 40.)  California Government Code section 815.2(a) provides:

23              A public entity is liable for injury proximately caused by an act or
              omission of an employee of the public entity within the scope of his
24              employment if the act or omission would, apart from this section,
              have given rise to a cause of action against that employee or his
25              personal representative.

26   Cal. Gov't Code § 815.2(a).

27         California Government Code section 820(a) provides: "Except as otherwise provided by

28   statute (including Section 820.2), a public employee is liable for injury caused by his act or

                                        8

omission to the same extent as a private person." Cal. Gov't Code § 820(a). California

Government Code sections 815.2(a) and 820(a) do not create a substantive right of action that

stands alone. See Risse v. Porter, 2020 WL 1433144, at *8 (E.D. Cal. Mar. 24, 2020) (citing

Hearns v. Gonzales, 2018 WL 1790800, at *2 (E.D. Cal. Apr. 16, 2018)). Accordingly, plaintiff's

claims against defendant Sacramento County pursuant to California Government Code sections

815.2(a) and 820.(a) should be dismissed.

California Government Code section 845.6 provides,

> Neither a public entity nor a public employee is liable for injury
> proximately caused by the failure of the employee to furnish or
> obtain medical care for a prisoner in his custody; but, except as
> otherwise provided by Sections 855.8 and 856, a public employee,
> and the public entity where the employee is acting within the scope
> of his employment, is liable if the employee knows or has reason to
> know that the prisoner is in need of immediate medical care and he
> fails to take reasonable action to summon such medical care.

Cal. Gov't. Code § 845.6.

To state a claim under section 845.6, plaintiff must allege that: "(1) the public employee

knew or had reason to know of the need (2) for immediate medical care, and (3) failed to

reasonably summon such care." Jett v. Penner, 439 F.3d 1091, 1099 (9th Cir. 2006.) "Liability

under section 845.6 is limited to serious and obvious medical conditions requiring immediate

care." Watson v. State, 21 Cal. App. 4th 836, 841 (1993). The California Court of Appeal

clarified that section 845.6 "is very narrowly written to authorize a cause of action against a

public entity for its employees' failure to summon immediate medical care only, not for a certain

employee's malpractice in providing that care." Castaneda v. Dep't of Corrections and

Rehabilitation, 212 Cal. App. 4th 1051, 1070 (2013). "[O]nce an inmate is receiving medical

care, § 845.6 does not create a duty to provide adequate or appropriate care." Resendiz v. Cnty.

of Monterey, 2015 WL 7075694, at *8 (N.D. Cal. Nov. 13, 2015) (citing Watson, 21 Cal. App.

4th at 841-43). Thus, liability under section 845.6 attaches only when an employee fails to

summon medical care; the failure to provide further or adequate treatment, or to ensure further

diagnosis or treatment, is not actionable under section 845.6. See Castaneda, 212 Cal. App. 4th

1072. "Thus, once a prisoner is receiving medical care, prison employees are under no further

9

1    obligation under § 845.6."  <u>Pajas v. Cnty. of Monterey</u>, 2016 WL 3648686, at *12 (N.D. Cal. July

2    8, 2016).

3          Plaintiff's claim against defendant Sacramento County based on section 845.6 is

4    apparently based on the Fourteenth Amendment claims against defendants Kim and Gomez for

5    allegedly failing to provide plaintiff with a Philadelphia collar, denying plaintiff access to

6    showers and instead ordering bird baths, and failing to follow aftercare orders regarding wound

7    care issued by Kaiser Permanente South Hospital.  These claims against defendants Kim and

8    Gomez are not based on the failure of these defendants to summon immediate medical care.  For

9    this reason, plaintiff does not state a potentially colorable claim pursuant to section 845.6 against

10   defendant Sacramento County.  <u>See</u> <u>Jett</u>, 439 F.3d at 1099.

11          3.  <u>Claim Three: Alleged Denial of Inadequate Medical Care Against Defendants</u>

12              <u>Sacramento County and Hailey-Currey</u>

13                    *a. Allegations Made in Support of Claim Three*

14          The Court first sets forth what appear to be the allegations made in support of claim three.

15   On October 21, 2022, plaintiff was removed from the 2E urgent care cell originally assigned and

16   transferred to the 300 housing unit into cell 309.  (ECF No. 8 at 14.)  Defendant Hailey-Currey,

17   performing pill call, requested that plaintiff come to the door of his cell to receive his medication.

18   (<u>Id.</u>)  During this interaction, defendant Hailey-Currey recklessly removed plaintiff's Aspen

19   cervical collar, held plaintiff's injured neck and spun plaintiff's head around before restoring the

20   C-collar.  (<u>Id.</u>)  Defendant Hailey-Currey provided no warning that she was going to remove the

21   C-collar and did not place plaintiff in a supportive recumbent position before doing so.  (<u>Id.</u>)

22   Defendant Hailey-Currey restored the cervical collar to plaintiff's neck incorrectly, causing

23   discomfort and poor neck positioning.  (<u>Id.</u>)  Plaintiff began to experience an extreme burning

24   sensation in his neck and hands and a shooting pain in his extremities.  (<u>Id.</u> at 14-15.)  Plaintiff

25   alleges that defendant Hailey-Currey failed to treat his neck injury with proper care.  (<u>Id.</u> at 15.)

26                              *b. Analysis*

27          Plaintiff alleges that defendant Hailey-Currey violated plaintiff's Fourteenth Amendment

28   right to adequate medical care based on the allegations set forth above.  (<u>Id.</u> at 42.)  This Court

finds that claim three states a potentially colorable claim against defendant Hailey-Currey for violating plaintiff's Fourteenth Amendment right to adequate medical care based on the allegations that defendant Hailey-Currey forcefully removed plaintiff's cervical collar and incorrectly restored the cervical collar to plaintiff's neck.

Apparently based on the allegations set forth above, plaintiff alleges that defendant Sacramento County violated plaintiff's right to adequate medical care by acting as the policy making authority, maintaining policies or custom that resulted in the violation of plaintiff's Fourteenth Amendment right to adequate medical care.  (Id. at 42-43.)  However, in support of claim three, plaintiff alleges no facts demonstrating that the alleged deprivations occurred as a result of a policy, custom or practice of defendant Sacramento County.  Accordingly, this Court finds that claim three fails to state a potentially colorable Monell claim against defendant Sacramento County.

Plaintiff also alleges that defendant Sacramento County is vicariously liable for the actions of its employees pursuant to California Government Code sections 815.2(a), 820(a) and 845.6.  (Id. at 43.)  As discussed above, sections 815.2(a) and 820(a) do not create substantive rights of action that stand alone.  Accordingly, plaintiff's claims pursuant to California Government Code sections 815.2(a) and 820(a) should be dismissed.

Plaintiff's claim against defendant Sacramento County pursuant to California Government Code section 845.6 appears to be based on the claim against defendant Hailey-Currey.  Plaintiff's claim against defendant Hailey-Currey is not based on defendant Hailey-Currey's alleged failure to summon immediate medical care.  For this reason, plaintiff fails to state a potentially colorable claim against defendant Sacramento County pursuant to section 845.6.  See Jett, 439 F.3d at 1099.  Accordingly, this claim should be dismissed.

        4.  <u>Claim Five: Alleged Denial of Adequate Medical Care Against Defendants Sacramento County, Masood, Mossett, Akudinobi, Glaser, Reema and Gladys</u>

*a.  Allegations in Support of Claim Five*

This Court first sets forth the allegations that appear to be made in support of claim five. On November 17, 2022, plaintiff transferred to the RCCC Medical Housing Unit ("MHU").

1   (ECF No. 8 at 17.)  Plaintiff was in the MHU from November 17, 2022 until December 1, 2022.

2   (Id. at 19.)  Kaiser Permanente South Hospital had made the following relevant discharge orders:

3   1) it was recommended that plaintiff have a follow-up appointment with a neurosurgeon four

4   weeks after the date of injury; and 2) it was recommended that plaintiff wear a cervical collar for

5   90 days until cleared by a neurosurgeon.  (Id. at 19.)  Plaintiff's injuries were treated so poorly

6   that plaintiff wore the cervical collar for the majority of 150 days.  (Id.)  On November 29, 2022,

7   plaintiff was recommended to begin physical therapy by Kaiser Permanente neurosurgeon Dr.

8   Doyley.  (Id.)  Plaintiff had his first physical therapy appointment on September 28, 2023.  (Id.)

9   Plaintiff was informed that he was only allowed 5 physical therapy sessions.  (Id.)

10          On November 28, 2022, defendant Masood conducted a cursory follow-up examination of

11   plaintiff.  (Id. at 21.)  Plaintiff told defendant Masood that plaintiff could not extend his arms

12   beyond a 90 degree angle without experiencing pain.  (Id.)  Defendant Masood reported,

13   "Plaintiff was able to perform everyday tasks without difficulty, squatting, climbing a bench and

14   walking with agility."  (Id.)  Plaintiff alleges that defendant Masood failed to properly assess the

15   mobility impairments plaintiff suffered primarily to his upper body.  (Id.)  Plaintiff still faced

16   challenges with lifting, standing for long periods of time, neck pain from "prolonged upright

17   position," and upper back pain from standing for prolonged periods of time.  (Id. at 22.)  Plaintiff

18   was still required to wear a cervical collar for 49 more days before transitioning to a less

19   supportive medical assistive device.  (Id.)  Defendant Masood initiated the process to transfer

20   plaintiff out of the MHU on November 28, 2022.  (Id. at 22.)  Defendant Mossett wrote in his

21   report, "patient will be taken to Main Jail tomorrow for appointment in-house when he returns the

22   patient will be housed in SBF per Dr. Masood order."  (Id.)  In other words, defendant Masood

23   ordered plaintiff's discharge from the MHU prior to an order authorizing plaintiff's discharge

24   from the MHU by the neurosurgeon.  (Id. at 23.)  Defendant Masood lacked the specialized

25   training required to make the decision regarding whether plaintiff was ready to be discharged

26   from the MHU.  (Id.)  Plaintiff's premature discharge from the MHU denied plaintiff the level of

27   care and medical supervision required to heal properly.  (Id.)

28          On November 29, 2022, plaintiff saw the neurosurgeon.  (Id. at 22.)  Plaintiff appears to

refer to his November 29, 2022 appointment with Kaiser Permanente neurosurgeon Dr. Doyley. During this appointment, the neurosurgeon told plaintiff that plaintiff was not medically cleared to remove the cervical collar. (<u>Id.</u>) The neurosurgeon also informed plaintiff that due to the soft tissue damage from the trauma of the bullet, healing would be a two part process. (<u>Id.</u>) The neurosurgeon told plaintiff that both the bone and tissue had to repair, and that requires support. (<u>Id.</u>) Because there was severe soft tissue damage, the biggest challenge would be restoring mobility and strength to fully recover. (<u>Id.</u>) The neurosurgeon made the following recommendations: 1) physical therapy for plaintiff's left arm, shoulder and hand; and 2) transition to aspen collar to soft collar in next two weeks, soft collar for comfort use only (sitting, laying down). (<u>Id.</u>)

On November 30, 2022, defendant Masood conducted another cursory follow-up examination and informed plaintiff that plaintiff was required to trade his Aspen-C collar for his soft collar. (<u>Id.</u> at 24.) Defendant Masood misunderstood the aftercare orders, which stated that plaintiff should be provided with both C-collars to alternate between based on activity performed. (<u>Id.</u>) Plaintiff asked defendant Masood to call Kaiser Permanente South Hospital to get clarification regarding plaintiff's use of the collars. (<u>Id.</u> at 25.) Defendant Masood issued an order for plaintiff to alternate between the C-collars, wearing one on Monday-Wednesday-Friday, and the other on Tuesday-Thursday-Saturday-Sunday. (<u>Id.</u>) Defendant Masood clearly did not understand the aftercare orders regarding plaintiff's wearing of the collars. (<u>Id.</u>)

Defendant Masood medically cleared plaintiff for discharge from the MSU. (<u>Id.</u>) Defendant Barrera informed plaintiff that plaintiff was being transferred to the JFK unit. (<u>Id.</u>) Plaintiff transferred to the JFK unit on December 1, 2022.[1] (<u>Id.</u>) Plaintiff's premature discharge from the MHU created a substantial risk to plaintiff's health and safety due to the vulnerability of plaintiff's neck because plaintiff still wore a cervical collar. (<u>Id.</u>) On December 6, 2022, plaintiff was transferred back to the MHU and determined to be a high level of risk for reinjury. (<u>Id.</u> at

---

[1]  In the second amended complaint, plaintiff alleges that he transferred to the JFK unit on December 1, 2023. (<u>Id.</u> at 25.) It appears that plaintiff meant to allege that he was transferred to the JFK unit on December 1, 2022.

1    26.)

2    Defendant Akudinobi discovered that a quarantine order was placed on plaintiff because

3    plaintiff's hospital appointment posed a health risk due to exposure to viruses and disease that

4    could spread to the jail population.  (Id. at 23-24.)  Defendant Akudinobi contacted defendants

5    Masood, Glaser, Tracy, Reema and Gladys to expedite the removal of the quarantine orders.  (Id.

6    at 24.)  Defendant Mossett had concerns about cancelling the quarantine orders.  (Id.)  Defendants

7    Akudinobi, Masood, Glaser, Tracy, Reema and Gladys prematurely removed the quarantine

8    order.  (Id.)

9                                       *b.  Analysis*

10   Plaintiff alleges that defendants violated plaintiff's Fourteenth Amendment right to

11   adequate medical care by failing to perform the necessary evaluations for plaintiff, putting

12   plaintiff at risk of serious injury.  (Id. at 44.)

13   This Court finds that plaintiff states a potentially colorable Fourteenth Amendment claim

14   against defendant Masood for authorizing plaintiff's transfer out of the MHU in disregard of

15   plaintiff's serious medical needs.  This Court also finds that plaintiff states a potentially colorable

16   Fourteenth Amendment claim against defendant Masood based on the allegations that defendant

17   Masood ordered plaintiff to alternate wearing the different C collars, in violation of the aftercare

18   orders issued by Kaiser Permanente South Hospital.

19   Plaintiff appears to claim that defendants Akudinobi, Masood, Glaser, Tracy, Reema and

20   Gladys violated plaintiff's Fourteenth Amendment rights by prematurely removed the quarantine

21   order.  These allegations fail to state a potentially colorable claim because plaintiff does not have

22   standing to raise this claim.  To have standing, a plaintiff may only assert claims on his own

23   behalf.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (the court's standing

24   inquiry focuses on, inter alia, an injury to plaintiff).  The alleged injury caused by plaintiff's

25   premature release from quarantine, i.e., the spread of diseases to other inmates in the jail, did not

26   harm plaintiff.  Plaintiff does not have standing to raise claims on behalf of other inmates

27   allegedly exposed to diseases caused by plaintiff's premature removal from quarantine.

28   Accordingly, this claim should be dismissed.

1    This Court also observes that in support of claim five, plaintiff alleges a delay in receipt of

2    physical therapy.  The Civil Rights Act under which this action was filed provides as follows:

3          Every person who, under color of [state law] . . . subjects, or causes
           to be subjected, any citizen of the United States . . . to the deprivation

4          of any rights, privileges, or immunities secured by the Constitution .
           . . shall be liable to the party injured in an action at law, suit in equity,

5          or other proper proceeding for redress.

6    42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

7    actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

8    Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983

9    liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no

10   affirmative link between the incidents of police misconduct and the adoption of any plan or policy

11   demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another

12   to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative

13   act, participates in another's affirmative acts or omits to perform an act which he is legally

14   required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588

15   F.2d 740, 743 (9th Cir. 1978).

16   Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

17   their employees under a theory of respondeat superior and, therefore, when a named defendant

18   holds a supervisorial position, the causal link between him and the claimed constitutional

19   violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979)

20   (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d

21   438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert.

22   denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning the involvement of

23   official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673

24   F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of personal

25   participation is insufficient).

26   To the extent plaintiff intended to raise a claim based on the alleged delay in his receipt of

27   physical therapy, no defendants are linked to this claim.  For this reason, the Court does not find

28   that plaintiff states a potentially colorable claim based on the alleged delay in receipt of physical

15

1   therapy.

2        Apparently based on the allegations set forth above, plaintiff alleges that defendant

3   Sacramento County violated plaintiff's right to adequate medical care by acting as the policy

4   making authority, maintaining policies or custom that resulted in the violation of plaintiff's

5   Fourteenth Amendment right to adequate medical care.  (Id. at 44-45.)  However, in support of

6   claim five, plaintiff alleges no facts demonstrating that the alleged deprivations occurred as a

7   result of a policy, custom or practice of defendant Sacramento County.  Accordingly, this Court

8   finds that claim five fails to state a potentially colorable <u>Monell</u> claim against defendant

9   Sacramento County.

10       Plaintiff also alleges that defendant Sacramento County is vicariously liable for the

11   actions of its employees pursuant to California Government Code sections 815.2(a), 820(a) and

12   845.6.  (Id. at 44.)  As discussed above, sections 815.2(a) and 820(a) do not create substantive

13   rights of action that stand alone.  Accordingly, plaintiff's claims pursuant to California

14   Government Code sections 815.2(a) and 820(a) should be dismissed.

15       Plaintiff's claim against defendant Sacramento County pursuant to California Government

16   Code section 845.6 appears to be based on the claims against defendant Masood for allegedly

17   ordering plaintiff's premature release from the MHU and ordering plaintiff to wear the different C

18   collars, in violation of the aftercare orders issued by Kaiser Permanente South Hospital.

19   Plaintiff's claims against defendant Masood are not based on defendant Masood's failure to

20   summon immediate medical care.  For this reason, plaintiff fails to state a potentially colorable

21   claim against defendant Sacramento County pursuant to section 845.6.  <u>See Jett</u>, 439 F.3d at

22   1099.  Accordingly, this claim should be dismissed.

23          5.  <u>Claim Six: Alleged Denial of Adequate Medical Care Against Defendants</u>

24              <u>Sacramento County, Muring, Kaur, Smith and does 5-8 (Mora, Cervantes, Her</u>

25              <u>and Copenhaver)</u>

26              *a.  Allegations in Support of Claim Six*

27       The Court first sets forth the allegations which appear to be made in support of claim six.

28   After plaintiff's return to the MHU on December 6, 2022, plaintiff informed defendants Muring,

1    Kaur and does 5-8 that plaintiff's wounds were exposed as they were improperly wrapped during

2    the previous wound care treatment.  (ECF No. 8 at 26.)  Plaintiff requested wound care to prevent

3    risk of exposure.  (Id.)  Plaintiff was informed that he would receive wound care when the

4    medical staff had time.  (Id.)  Plaintiff waited for one hour then pressed his intercom button.  (Id.)

5    No staff responded.  (Id.)  Plaintiff made one final attempt to engage with defendants Muring,

6    Kaur and does 5-8 via the intercom.  (Id. at 26-27.)  After this failed attempt, defendant Smith

7    responded.  (Id. at 27.)  Defendant Smith asked plaintiff why plaintiff kept pressing his intercom

8    button.  (Id.)  Plaintiff told defendant Smith that he pressed the medical assistance button because

9    plaintiff needed wound care.  (Id.)  Defendant Smith told plaintiff that the medical staff was

10    aware of plaintiff's wound care and that, "the intercom button is only for emergencies so stop

11    pressing it or I'm giving you a disciplinary write-up."  (Id.)  Plaintiff alleges that defendant Smith

12    attempted to prevent plaintiff from requesting medical care.  (Id. at 28.)  Defendants Muring,

13    Kaur and does 5-8 refused to provide plaintiff with medical care and their shift ended without

14    these defendants contacting plaintiff.  (Id.)  Plaintiff did not receive wound care for over five

15    hours, when the next shift performed plaintiff's wound care.  (Id.)

                                    *b. Analysis*

17        Plaintiff alleges that defendants Muring, Kaur, Smith and does 5-8 (Mora, Cervantes, Her

18    and Copenhaver) denied plaintiff wound care.  Plaintiff alleges that plaintiff had to wait over five

19    hours to receive wound care from the next shift.  As discussed above, an element of a pretrial

20    detainee's Fourteenth Amendment claim for inadequate medical care is that defendants caused

21    plaintiff's injuries.  See Gordon, 888 F.3d at 1125.  Here, plaintiff fails to allege that he suffered

22    any injury as a result of the approximately five hour delay in his receipt of wound care.  Plaintiff

23    does not claim, for example, that his wounds worsened as a result of the delay in his receipt of

24    wound care.  Based on plaintiff's failure to allege any injury based on this delay, this Court finds

25    that plaintiff fails to state a potentially colorable Fourteenth Amendment claim against defendants

26    Muring, Kaur, Smith and does 5-8 (Mora, Cervantes, Her, and Copenhaver).  See also Shapley v.

27    Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) ("Mere delay of surgery,

28    without more, is insufficient to state a claim for deliberate medical indifference … [plaintiff has]

1    no claim for deliberate medical indifference unless the denial was harmful.").

2    　　　Apparently based on the allegations set forth above, plaintiff alleges that defendant

3    Sacramento County violated plaintiff's right to adequate medical care by acting as the policy

4    making authority, maintaining policies or custom that resulted in the violation of plaintiff's

5    Fourteenth Amendment right to adequate medical care.  (Id. at 45.)  However, in support of claim

6    six, plaintiff alleges no facts demonstrating that the alleged deprivations occurred as a result of a

7    policy, custom or practice of defendant Sacramento County.  Moreover, plaintiff fails to allege a

8    violation of his Fourteenth Amendment right to adequate medical care.  Accordingly, this Court

9    finds that claim six fails to state a potentially colorable Monell claim against defendant

10    Sacramento County.

11    　　　Plaintiff also alleges that defendant Sacramento County is vicariously liable for the

12    actions of its employees pursuant to California Government Code sections 815.2(a), 820(a) and

13    845.6.  (Id. at 45-46.)  As discussed above, sections 815.2(a) and 820(a) do not create substantive

14    rights of action that stand alone.  Accordingly, plaintiff's claims pursuant to California

15    Government Code sections 815.2(a) and 820(a) should be dismissed.

16    　　　Plaintiff's claim against defendant Sacramento County pursuant to California Government

17    Code section 845.6 appears to be based on the Fourteenth Amendment claims against defendants

18    Muring, Kaur, Smith and does 5-8 (Mora, Cervantes, Her and Copenhaver) for allegedly denying

19    plaintiff's requests for wound care.  Plaintiff's claims against defendants Muring, Kaur, Smith

20    and does 5-8 (Mora, Cervantes, Her and Copenhaver) are not based on defendants' failure to

21    summon immediate medical care.  For this reason, plaintiff fails to state a potentially colorable

22    claim against defendant Sacramento County pursuant to section 845.6.  See Jett, 439 F.3d at

23    1099.  Accordingly, this claim should be dismissed.

24    　　　**B.  Claim Four:  Alleged Violation of Right to Communicate Against Defendants**

25    　　　　　　**Sacramento County and Does 1-4 (Smith, Mazzanti, Cervetti and Yang)**

26    　　　　　　　1.  Legal Standard

27    　　　The First Amendment protects "the right to communicate with persons outside prison

28    walls."  Valdez v. Rosenblum, 302 F.3d 1039, 1048 (9th Cir. 2002).  "Use of a telephone

1   provides a *means* of exercising this right." Id. (emphasis in original.)  A regulation that impinges

2   on an inmate's constitutional right ""is valid if it is reasonably related to legitimate penological

3   interests.'"  Id. (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

4                2.  Allegations in Support of Claim Four

5        The Court first sets forth the allegations which appear to be made in support of claim four.

6   From October 17, 2022 until October 21, 2022, plaintiff was housed on 2 East urgent care

7   housing.  (ECF No. 8 at 15.)  The urgent care unit does not have a day room area with phones.

8   (Id.)  Instead, the staff provides the patient with a phone to be used through their cell food slot.

9   (Id.)  When plaintiff attempted to make calls using the secure phone system, plaintiff continued to

10   receive an error message: "The phone number you are trying to call is restricted."  (Id.)

11   Assuming this was an error, plaintiff tried to make additional calls to different phone numbers

12   including the Sacramento Public Defenders Office.  (Id. at 15-16.)  Another inmate discovered

13   that the phones were not functioning properly.  (Id.)  The phone remained inoperable for the

14   duration of plaintiff's stay in the urgent care unit.  (Id.)  Plaintiff claims that from October 17,

15   2022 until October 21, 2022, doe defendants 1-4 "enabled" the outgoing call restriction feature,

16   which restricted outgoing calls by inmates.  (Id.)  Defendants had no legal justification to restrict

17   outgoing calls and prevent plaintiff from accessing the phones.  (Id.)

18              3.  Analysis

19        Although plaintiff's alleged denial of access to the phone was brief, this Court finds that

20   plaintiff's claim alleging that doe defendants 1-4 (defendants Smith, Mazzanti, Cervetti and

21   Yang) "enabled" the outgoing call restriction feature, which restricted outgoing calls by inmates

22   for no legitimate penological reason, states a potentially colorable claim for violation of

23   plaintiff's First Amendment right to communicate.

24        Plaintiff's second amended complaint contains no claim that plaintiff's alleged inability to

25   use the phone was caused by a policy, custom or practice of defendant Sacramento County.  For

26   these reasons, this Court finds that claim four fails to state a potentially colorable Monell claim

27   against defendant Sacramento County.

28   / / /

1

2

**C.  Claim Seven:  Alleged Violation of Right to Exercise Against Defendants**

**Sacramento County, Smith, Barrera, Yang, Cervetti and Mora**

3

      1.  Legal Standard

4

"[T]he Fourteenth Amendment requires that pre-trial detainees not be denied adequate

5

opportunities for exercise without legitimate governmental objective."  Pierce v. County of

6

Orange, 526 F.3d 1190, 1211-12 (9th Cir. 2008) (citing Bell v. Wolfish, 441 U.S. 520, 538

7

(1979)).  Pretrial detainees are required to have some form of outdoor or otherwise meaningful

8

recreation.  See Shorter v. Baca, 895 F.3d 1176, 1185-86 (9th Cir. 2018).  The Ninth Circuit has

9

determined that while there is not a specific minimum amount of weekly exercise that must be

10

afforded to detainees, thirteen minutes a day for an indefinite period of time is unconstitutional.

11

Pierce, 526 F.3d at 1212; see also Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (finding

12

under Eighth Amendment's "cruel and unusual punishment" standard that state prisoners assigned

13

to restrictive unit for a period of years had the "right of outdoor exercise one hour per day, five

14

days a week unless inclement weather, unusual circumstances, or disciplinary needs made that

15

impossible"); Allen v. Sakai, 48 F.3d 1082, 1087-88 (9th Cir. 1994) (holding forty-five minutes

16

of outdoor recreation once a week for six weeks to be unconstitutional); Toussaint v. Yockey, 722

17

F.2d 1490, 1492-93 (9th Cir. 1984) (holding that denying inmates who had been in administrative

18

segregation for over one year outdoor exercise raised constitutional concerns); but see LeMaire v.

19

Maass, 12 F.3d 1444, 1457-58 (9th Cir. 1993) (holding there was no constitutional violation

20

where plaintiff's outdoor exercise privileges were removed when plaintiff abused those privileges

21

and he represented a security risk).

22

      Detainees who are held for more than a "short time" should have five to seven hours of

23

exercise per week outside of their cells.  See Pierce, 526 F.3d at 1212.

24

               2. Allegations Made in Support of Claim Seven

25

      This Court first sets forth the allegations that appear to be made in support of claim seven.

26

Plaintiff was housed in RCCC from November 17, 2022 to December 1, 2022 and from

27

December 6, 2022 to March 14, 2023.  (Id. at 29.)  Out-of-cell time is defined as access to

28

phones, day room, recreational yard, showers, facility programs and any privileges an inmate

20

lacks while confined to a cell.  (Id.)  Plaintiff alleges that the Mays[2] consent decree provides that inmates shall receive 17 hours per week of out-of-cell time.  (Id.)  Defendants Smith and Barrera were responsible for out-of-cell time during the morning shift.  (Id.)  Defendants Smith and Barrera told plaintiff that plaintiff would be given one hour outside of his cell per day for activities and exercise.  (Id.)  At that time, Kaiser Permanente South Hospital aftercare orders instructed plaintiff to walk regularly as physical therapy.  (Id.)

Defendants Yang and Cervetti were responsible for out-of-cell time during the night shift. (Id. at 30.)  Defendants Yang and Cervetti told plaintiff that plaintiff would be provided a fifteen minute shower every other day of the week.  (Id. at 30.)  Plaintiff received a 15 minute shower every other day from November 17, 2022 to December 1, 2022.  (Id.)  Plaintiff received 15 minute showers every other day from December 6, 2022 until January 1, 2022  (Id.)  Plaintiff also claims that from December 25, 2022 through January 1, 2022, plaintiff received no shower.  (Id.) Plaintiff received 15 minute showers every other day from January 13, 2023 to March 1, 2023. (Id. at 31.)  On March 1, 2023, defendants Cervetti, Yang and Mora began conducting daily showers.  (Id.)  On March 12, 2023, defendant Cervetti began denying plaintiff daily showers. (Id.)  On March 15, 2023, defendant Cervetti denied plaintiff's request for a shower.  (Id.) Plaintiff wrote a grievance against defendants Cervetti, Yang and Mora based on the alleged denial of showers.  (Id.)

From November 17, 2022 until December 1, 2022, plaintiff received 7 hours per week of out-of-cell time.  (Id. at 30.)  From December 6, 2022 to January 1, 2023, plaintiff received 7 hours per week of out-of-cell time.  (Id.)  From January 13, 2023 to March 1, 2023, plaintiff received 7 hours per week of out-of-cell time.  (Id.)  The weekly out-of-cell time plaintiff received fell below the 17 hours required by the Mays consent decree.  (Id.)  On March 1, 2023, defendants Barrera and Smith began providing plaintiff with the minimum required out-of-cell time during the morning shift.  (Id. at 31.)

---

[2]  By referring to Mays, plaintiff appears to refer to Mays v. Sacramento, 2:18-cv-2081 TLN CSK P (E.D. Cal.) ("Mays").  Mays is a class action filed in this district court challenging conditions of confinement in the Sacramento County Jail.

1    Defendants Yang, Cervetti and Mora made false entries in the out-of-cell logging system.

2    (Id.)

3        3. <u>Analysis</u>

4    At this outset, this Court observes that to the extent plaintiff seeks to state a claim for

5    violation of an order issued in <u>Mays</u>, <u>Mays</u> does not provide for an independent cause of action.

6    This Court also observes that plaintiff's allegations regarding claim seven include allegations

7    regarding plaintiff's access to showers.  However, plaintiff does not raise a separate claim based

8    on denial of access to showers, as he did in the original complaint.  In the order screening

9    plaintiff's original complaint, this Court dismissed plaintiff's claim regarding access to showers

10    with leave to amend.  (ECF No. 4 at 12-13.)  Because plaintiff's second amended complaint does

11    not clearly raise a claim alleging inadequate shower access, this Court will not address whether

12    the allegations in the second amended complaint state a potentially colorable claim for violation

13    of the right to adequate showers.

14    According to the allegations in the second amended complaint, plaintiff received seven

15    hours per week of out-of-cell time for the entire time he was housed in RCCC but for January 2,

16    2023 to January 12, 2023.  Seven hours per week of out-of-cell exercise time meets the minimal

17    constitutional standard.  <u>See</u> <u>Pierce</u>, 526 F.3d at 1212 (detainees who are held for more than a

18    "short time" should receive five to seven hours of exercise outside of their cells).  While plaintiff

19    alleges that he received seven hours of out-of-cell time per week for "activities and exercise," this

20    Court finds that these allegations fail to demonstrate that plaintiff was denied adequate exercise in

21    violation of the constitution.

22    In the second amended complaint, plaintiff does not address the amount of out-of-cell

23    time he received from January 2, 2023 to January 12, 2023.  Accordingly, this Court finds that

24    plaintiff fails to demonstrate that he was denied constitutionally adequate out-of-cell exercise

25    time from January 2, 2023 to January 12, 2023.

26    This Court also finds that plaintiff's second amended complaint fails to state a potentially

27    colorable claim against defendant Sacramento County for violation of plaintiff's right to exercise

28    for two reasons.  First, plaintiff fails to demonstrate a violation of his right to exercise.  Second,

22

1  plaintiff pleads no facts demonstrating that his alleged inability to exercise was caused by a

2  policy, custom or practice of defendant Sacramento County.  For these reasons, this Court finds

3  that claim seven fails to state a potentially colorable <u>Monell</u> claim against defendant Sacramento

4  County.

5  **D.  Claims Six and Eight: Alleged Retaliation**

6  1.  <u>Legal Standard for Retaliation Claim</u>

7  A viable claim of First Amendment retaliation entails five basic elements: 1) an assertion

8  that a state actor took some adverse action against an inmate 2) because of 3) the inmate's

9  protected conduct, and 4) the adverse action chilled the inmate's exercise of his First Amendment

10  rights and 5) did not reasonably advance a legitimate penological purpose.  <u>See</u> <u>Rhodes v.</u>

11  <u>Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005), <u>see also</u> <u>Wilson v. Pima County Jail</u>, 256 Fed.

12  App'x 949, 950 (9th Cir. 2007) (applying <u>Rhodes</u> test to pretrial detainee's retaliation claim).

13  2.  <u>Claim Six:  Retaliation Claim Against Defendant Smith</u>

14  *a.  Allegations Made in Support of Claim Six*

15  This Court first sets forth the allegations that appear to be made in support of the

16  retaliation claim raised in claim six.[3]  On November 21, 2022, defendant Smith transported

17  plaintiff to an appointment to get x-rays.  (ECF No. 8 at 20.)  During this time, defendant Smith

18  asked plaintiff about the officer involved shooting, which had occurred during plaintiff's arrest.

19  (<u>Id.</u>)  Defendant Smith confirmed his knowledge of some of the details of the incident that were

20  publicly available and overheard through conversation.  (<u>Id.</u>)  During this conversation, defendant

21  Smith became frustrated and told plaintiff, "when the doctors get back, I'm going to make sure I

22  have you medically cleared…I'm sending you to [a] housing until with a cell just like this one so

23  get used to it."  (<u>Id.</u> at 21.)  Defendant Smith had no authority to approve medical clearances.

24  (<u>Id.</u>)  Plaintiff told defendant Smith that defendant Smith was overstepping his boundaries when

25  making the claim that he had that kind of power and/or influence.  (<u>Id.</u>)  On November 27, 2022,

26  plaintiff sent a complaint against defendant Smith to the Sacramento County Sheriff's Internal

27

28  [3]  Claim six also includes inadequate medical care allegations as described above.

23

1  affairs via email.  (Id.)

2      Plaintiff alleges that on December 1, 2022, defendant Smith refused to provide plaintiff

3  with wound care in retaliation for plaintiff filing the complaint against defendant Smith on

4  November 27, 2022.  (Id. at 28.)

5          *b. Analysis*

6      As set forth above in the discussion of plaintiff's inadequate medical care claim raised in

7  claim six, plaintiff alleges that on December 1, 2022 plaintiff asked defendants Muring, Kaur and

8  does 5-8 (defendants Mora, Cervantes, Her and Copenhaver) for wound care.  (Id. at 26.)

9  Plaintiff was informed that he would be provided wound care when the medical staff had time.

10  (Id.)  Plaintiff alleges that defendants Muring, Kaur, Mora, Cervantes, Her and Copenhaver were

11  not directly referenced in any complaint but were indirectly referenced during a complaint "to

12  ADA compliance via jail phone call and during the follow up hearing for the November 27, 2022

13  incident."  (Id. at 28.)  These allegations do not suggest that defendants Muring, Kaur, Mora,

14  Cervantes, Her, and Copenhaver denied plaintiff wound care on December 1, 2022 for retaliatory

15  reasons.

16      Even assuming that defendant Smith denied plaintiff wound care on December 1, 2022 in

17  retaliation for plaintiff filing a grievance against defendant Smith on November 27, 2022,

18  plaintiff's second amended complaint contains allegations indicating that plaintiff was denied

19  wound care on December 1, 2022 for another reason, i.e., medical staff were unavailable.  In

20  order to state a potentially colorable retaliation claim, plaintiff must show that his protected

21  conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  Brodheim

22  v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009).  The causation must be but-for causation: in other

23  words, without the retaliatory animus, the adverse action would not have been taken.  See

24  Hartman v. Moore, 547 U.S. 250, 260 (2005.)  Because the second amended complaint contains

25  allegations indicating that plaintiff was denied wound care because no medical staff were

26  available, plaintiff fails to demonstrate that defendant Smith's alleged retaliatory animus was the

27  but for cause of plaintiff's failure to receive wound care.  For this reason, plaintiff fails to state a

28  potentially colorable retaliation claim against defendant Smith.

3. <u>Claim Eight: Retaliation Claim Against Defendants Sacramento County, Smith,
Mazzanti and Melissa</u>

*a. Allegations Made in Support of Claim Eight*

This Court first sets forth the allegations that appear related to claim eight.  On November 27, 2022, defendant Smith attempted to transfer plaintiff from cell 40 to cell 37.  (ECF No. 8 at 20.)  Plaintiff refused, explaining that plaintiff had been moved five times in one month and did not see any reason to be moved from cell 40.  (<u>Id.</u>)  Plaintiff also told defendant Smith that based on plaintiff's limited mobility, cell 40 accommodated plaintiff's medical conditions and cell 37 was too restrictive to provide these accommodations.  (<u>Id.</u>)  On December 6, 2022, defendant Smith transferred plaintiff to cell 37 in retaliation for the grievance plaintiff filed against defendant Smith on November 27, 2022.  (<u>Id.</u> at 32, 34.)  On December 8, 2022, defendant Barrera moved plaintiff from cell 37 to cell 40.  (<u>Id.</u> at 33.)  On December 13, 2022, defendant Smith transferred plaintiff to cell 37.  (<u>Id.</u> at 34.)  Plaintiff requested to speak to a sergeant about his concerns.  (<u>Id.</u>)  Plaintiff and defendants Smith, Melissa and Mazzanti had a brief meeting in the MHU control center.  (<u>Id.</u>)  Plaintiff informed defendants about the November 27, 2022 incident, the December 6, 2022 incident and grievances filed against defendant Smith and medical staff.  (<u>Id.</u>)  Plaintiff informed defendant Mazzanti of plaintiff's failure to receive 17 hours of out-of-cell time, etc.  (<u>Id.</u>)  Defendant Mazzanti dismissed plaintiff's concerns.  (<u>Id.</u>)

At this time, cell 35 (a barred cell) was unoccupied.  (<u>Id.</u>)  Plaintiff expressed his mental health concerns related to cell 37 and requested to be placed in cell 35.  (<u>Id.</u>)  Cell 35 could accommodate plaintiff's impairments and provide plaintiff with better access to other facility benefits that cell 37 could not.  (<u>Id.</u>)  Defendant Melissa claimed that cell 35 required maintenance and was classified as medically unfit to house any inmates.  (<u>Id.</u>)  Defendant Melissa's claims were false because an inmate was housed in cell 35 the following day.  (ECF No. 35.)  No maintenance was performed in cell 35 prior to the inmate being housed in the cell.  (<u>Id.</u>)

After the discussion with defendants Smith, Mazzanti and Melissa, plaintiff was moved to cell 37.  (<u>Id.</u>)  Plaintiff told defendant Smith that his tactics would not break plaintiff.  (<u>Id.</u>)

25

Defendant Smith then locked plaintiff's food slot, denying plaintiff access to phones, food, laundry and legal calls.  (Id.)

*b. Analysis*

In claim eight, plaintiff alleges that defendants Smith, Mazzanti and Melissa retaliated against plaintiff for filing grievances, including the grievance filed against defendant Smith on November 27, 2022, by housing plaintiff in cell 37 on or around December 13, 2022.  Plaintiff alleges that he informed defendants that cell 37 did not have the accommodations plaintiff needed based on his medical condition.  This Court finds that the allegations set forth above state a potentially colorable retaliation claim against defendants Smith, Mazzanti and Melissa.

Plaintiff alleges that defendant Sacramento County acted as the policy making authority, maintained policies or customs of action that caused the violation of plaintiff's rights alleged in claim eight.  (ECF No. 8 at 47.)  However, in support of claim eight, plaintiff alleges no facts demonstrating that the alleged deprivations occurred as a result of a policy, custom or practice of defendant Sacramento County.  Accordingly, this Court finds that claim eight fails to state a potentially colorable <u>Monell</u> claim against defendant Sacramento County.

4. <u>Additional Allegations Regarding Retaliation</u>

Plaintiff appears to allege that on March 16, 2023, he filed a grievance against defendants Cervetti, Yang, Mora and possibly defendants Smith and Barrera regarding their denial of plaintiff's requests for showers.  (<u>Id.</u> at 31.)  Plaintiff alleges that on March 16, 2023, defendant Masood received a staff request to determine plaintiff's housing.  (<u>Id.</u>)  The staff request sought to have plaintiff medically cleared.  (<u>Id.</u>)  Plaintiff appears to allege that the staff request for plaintiff to be medically cleared was made in retaliation for plaintiff filing a grievance on March 16, 2023.  (<u>Id.</u>)  Plaintiff alleges that twelve hours later, plaintiff was discharged from the MHU.  (<u>Id.</u> at 32.)  Plaintiff alleges that custody is required to wait for doctors to medically clear a patient before inquiring about housing.  (<u>Id.</u>)  Plaintiff suggests that defendants requested that plaintiff be medically cleared before a doctor medically cleared plaintiff, in violation of jail policy.  (<u>Id.</u>)

To the extent plaintiff raises a retaliation claim based on the allegations set forth above, this Court finds that plaintiff fails to state a potentially colorable retaliation claim.  Assuming that

1  defendants Cervetti, Yang, Mora, Smith and Barrera violated jail policy by requesting that

2  plaintiff be medically cleared before a doctor medically cleared plaintiff, plaintiff does not claim

3  that he should not have been medically cleared.  In other words, even without defendants' alleged

4  retaliatory animus in requesting that plaintiff be medically cleared, it appears that plaintiff would

5  have been medically cleared anyway.  Therefore, plaintiff fails to demonstrate that he would not

6  have been released from the MHU but for defendants' alleged retaliatory act of requesting

7  plaintiff's medical clearance.  See Hartman, 547 U.S. at 260.  For this reason, these allegations

8  fail to state a potentially colorable retaliation claim.

9       **E.  Claims Two and Nine:  ADA Claim Against Defendant Sacramento County**

10          1.  Legal Standard for ADA Claim

11      Title II of the ADA, which prohibits a public entity from discriminating against a qualified

12  individual with a disability on account of that individual's disability, covers pretrial detainees in

13  county jails.  See Pierce v. County of Orange, 526 F.3d 1190, 1214 (9th Cir. 2008) ("It is

14  undisputed that Title II applies to [county] jails' services, programs, and activities for

15  detainees.").  "To recover monetary damages under Title II of the ADA ..., a plaintiff must prove

16  intentional discrimination on the part of the defendant," and the standard for intentional

17  discrimination is deliberate indifference.  See Duvall v. County of Kitsap, 260 F.3d 1124, 1138

18  (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2011) (citing Ferguson v. City of

19  Phoenix, 157 F.3d 668, 674 (9th Cir. 1998)).  "Deliberate indifference requires both knowledge

20  that a harm to a federally protected right is substantially likely, and a failure to act upon that

21  likelihood."  Id. at 1139 (citing City of Canton v. Harris, 489 U.S. 378, 389 (1988)).

22      To state a Title II ADA claim, a plaintiff must allege: 1) that he is an individual with a

23  disability; 2) that he is otherwise qualified to participate in or receive the benefit of some public

24  entity's services, programs, or activities; 3) that he was either excluded from participation in or

25  denied the benefits of the public entity's services, programs or activities, or was otherwise

26  discriminated against by the public entity; and 4) that such exclusion, denial of benefits, or

27  discrimination was by reason of his disability.  See Thompson v. Davis, 295 F.3d 890, 895 (9th

28  Cir. 2002).

27

1    The proper defendant in an ADA action is the public entity responsible for the alleged

2    discrimination.  See U.S. v. Georgia, 546 U.S. 151, 153 (2006).  Thus, the County of Sacramento

3    would be the proper public entity for plaintiff's ADA claims regarding conditions at the

4    Sacramento County Jail.  See Duvall, 260 F.3d at 1141.  Under Title II of the ADA, the County of

5    Sacramento would be liable for the vicarious acts of its employees.  See id.

6        2.  Claim Two

7    In support of claim two, plaintiff alleges that defendants Kim and does 1-4 (defendants

8    Smith, Mazzanti, Cervetti and Yang) failed to provide plaintiff with "reasonable accommodation

9    or supportive devices" for plaintiff's disabilities during the course of plaintiff's incarceration in

10   the Sacramento County Jail.  (ECF No. 8 at 41.)  Plaintiff alleges that defendants Kim, Smith,

11   Mazzanti, Cervetti and Yang violated the ADA by failing to consult with qualified specialists to

12   investigate the details related to plaintiff's care, failing to provide access to a shower that would

13   "comply with the risk associated with" plaintiff's condition, failing to consult with plaintiff to

14   assess "capabilities in everyday life activities" and refusing medical assistive devices and shower

15   privileges.  (Id.)

16   In claim two, plaintiff appears to claim that the injuries he suffered during his arrest

17   constituted plaintiff's ADA disability.  For the following reasons, this Court finds that claim two

18   fails to state potentially colorable claims under the ADA.  Plaintiff's claim that he was not

19   provided with "supportive devices" appears to be based on plaintiff's claim that defendant Kim

20   failed to provide plaintiff with a Philadelphia collar.  The Ninth Circuit has held that "[t]he ADA

21   prohibits discrimination because of disability, not inadequate treatment for disability."  Simmons

22   v. Navajo County, 609 F.3d 1011, 1022 (9th Cir. 2010), overruled in part on other grounds,

23   Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc) (citing Bryant v.

24   Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's

25   simply failing to attend to the needs of its disabled prisoners…the ADA does not create a remedy

26   for medical malpractice.")).  In the second amended complaint, plaintiff does not allege that he

27   was denied a Philadelphia collar because of his disability.  Accordingly, plaintiff's claim that he

28   was denied a Philadelphia collar does not state a potentially colorable ADA claim.  See Reed v.

1   Fox, 2023 WL 6930802, at *7 (E.D. Cal. Oct. 19, 2023), report and recommendation adopted,

2   2024 WL 1304961 (E.D. Cal. Mar. 27, 2024) (concluding prisoner did not state basis for relief

3   under the ADA where allegations did not support an inference that the failure to provide

4   requested devices was because of prisoner's disabling condition); Torres v. Kamen, 2023 WL

5   11828315, at *7 (E.D. Cal. Jan. 26, 2023) (concluding prisoner failed to state cognizable ADA

6   claim where prisoner asserted "no facts alleging Defendants denied him ADA appliances or

7   medical care because of his disability").

8          Plaintiff's claim that defendant Sacramento County failed to consult with plaintiff

9   regarding his capabilities and qualified specialists to investigate the details related to plaintiff's

10  care fails to state a potentially colorable ADA claim because these allegations allege inadequate

11  treatment for plaintiff's disability rather than discrimination based on plaintiff's disability.  See

12  Simmons, 609 F.3d at 1022.

13         Plaintiff also appears to claim that his denial of access to showers violated the ADA.

14  However, in the second amended complaint, plaintiff alleges that he was denied showers although

15  plaintiff was capable of walking, showering independently and was self-ambulating.  (ECF No. 8

16  at 10.)  These allegations indicate that plaintiff was not denied access to showers based on his

17  disability.  Accordingly, plaintiff does not state a potentially colorable ADA claim based on his

18  alleged denial of access to showers.

19         In claim two, plaintiff alleges that defendant Sacramento County "maintained policies or

20  customs of action and inaction which failed to provide reasonable accommodation for [plaintiff's]

21  disabilities…"  (Id. at 42.)  Plaintiff alleges that there were reasonable accommodations available,

22  including contacting hospitals to provide clarification of orders, contacting hospital personnel to

23  better understand plaintiff's need for specified medical devices, medical accommodations or after

24  care.  (Id. at 42.)  This Court finds that these allegations fail to state a potentially colorable ADA

25  claim because these allegations suggest inadequate treatment for plaintiff's disability rather than

26  discrimination based on plaintiff's disability.

27         For the reasons set forth above, this Court finds that claim two fails to state a potentially

28  colorable ADA claim.

1          3.  <u>Claim Nine</u>

2          Claim nine is based on actions allegedly taken by defendants Dhaliwal, Gill, Her,

3   Cervantes and does 9-10 (defendants Gil and Barrera).  (<u>Id.</u> at 48.)  Claim nine appears to be

4   based on the following allegations.

5          Plaintiff alleges that on August 9, 2023, plaintiff was housed in the RCCC "K Barracks"

6   based on a disciplinary write-up issued by defendant Gil.  (<u>Id.</u> at 35.)  On August 5, 2023, a

7   disciplinary hearing was held and plaintiff was placed on five days of full restrictions.  (<u>Id.</u>)  Full

8   restrictions include 23 hour lockdown, restriction on all privileges, no phone calls except legal

9   phone calls, tablet restrictions and commissary restrictions.  (<u>Id.</u>)  Around midnight, defendants

10  Gil and Dhaliwal began to transfer plaintiff to the disciplinary housing unit.  (<u>Id.</u> at 35-36.)

11  Plaintiff advised defendant Dhaliwal of plaintiff's mobility impairments, including the injuries to

12  plaintiff's neck.  (<u>Id.</u> at 36.)  Plaintiff requested his required housing accommodations based on

13  plaintiff's mobility impairments.  (<u>Id.</u>)  Plaintiff was denied partial accommodations.  (<u>Id.</u>)  In

14  particular, plaintiff was denied his extra mattress, lower tier and one extra blanket.  (<u>Id.</u>)

15  Defendant Dhaliwal told plaintiff that defendant Gil could not verify these accommodations with

16  medical staff.  (<u>Id.</u>)

17         Plaintiff alleges that he was transferred to the disciplinary housing unit at around 11 p.m.

18  (<u>Id.</u>)  Plaintiff was instructed to leave his property and to take a mattress.  (<u>Id.</u>)  Plaintiff advised

19  defendants Her, Cervantes, Gil and Barrera of his required medical accommodations.  (<u>Id.</u>)

20  Plaintiff was housed on SBF 314 on an upper bunk, upper tier, one extra blanket instead of two

21  extra blankets, and initially not provided with a mattress.  (<u>Id.</u>)  Defendant Her failed to instruct

22  the inmate in cell 314 that the inmate was required to move to the upper bunk.  (<u>Id.</u>)  Plaintiff

23  alleges that he was required to sleep on a metal bed frame because he did not receive a mattress

24  for 4 to 8 hours.  (<u>Id.</u> at 37.)

25         In claim nine, plaintiff appears to claim that the injuries he suffered during his arrest

26  constituted plaintiff's ADA disability.  For the following reasons, this Court finds that claim nine

27  fails to state potentially colorable claims under the ADA.  In claim nine, plaintiff alleges that he

28  was denied the following accommodations while in disciplinary housing: an extra mattress, a

lower tier, a lower bunk and an extra blanket. As discussed above, the ADA prohibits discrimination because of disability, not inadequate treatment for disability. <u>Simmons</u>, 609 F.3d at 1022. The ADA is not violated by a prison's failure to attend to the needs of its disabled prisoners. <u>Bryant</u>, 84 F.3d at 249. In claim nine, plaintiff does not allege that he was discriminated against with regard to services, programs or activities by reason of his alleged disability. Rather, the alleged wrongful acts, i.e., the denial of an extra mattress, an extra blanket, a lower tier and lower bunk, raise claims for inadequate treatment of plaintiff's medical needs, which is insufficient to state an ADA claim. <u>See</u> <u>Mixon v. Tyson</u>, 2017 WL 5998231, at *5 (E.D. Cal. Dec. 4, 2017) (holding that refusal to provide an inmate a lower bunk chrono amounted to "lack of medical treatment or the failure to provide an accommodation for his medical condition, [which] does not provide a basis upon which to impose liability under the ADA"); <u>Muhammad v. California Department of Corrections and Rehabilitation</u>, 2024 WL 2274839, at *2 (E.D. Cal. May 20, 2024) (denial of specific mattress does not violate the ADA); <u>Petersen v. California Department of Corrections and Rehabilitation</u>, 2020 WL 7318906, at *6 (S.D. Cal. Dec. 11, 2020) (dismissing ADA claim where plaintiff asserting transfer to upper tier assignment failed to allege the transfer was made by reason of his disability). For these reasons, the ADA claims raised in claim nine are not potentially colorable.

Plaintiff's allegation that he was denied a mattress for 4 to 8 hours also fails to state a potentially colorable ADA claim. The alleged denial of a mattress for 4 to 8 hours raises a claim regarding inadequate treatment rather than discrimination because of disability. Accordingly, this claim should be dismissed.

**F. Due Process Claim**

Plaintiff includes factual allegations regarding alleged excessive time in disciplinary housing and alleged punishment without a hearing. (ECF No. 8 at 37-40.) Plaintiff alleges that he was punished without due process in violation of the Fourteenth Amendment. (<u>Id.</u> at 40.) However, in the section of the amended complaint addressing plaintiff's legal claims, plaintiff requests that his due process claim be dismissed without prejudice because plaintiff "does not have the capacity to handle all of the evidence associated with his total claims." (<u>Id.</u> at 49.)

1   Accordingly, this Court will not address plaintiff's claim that he was punished without a hearing

2   in violation of his Fourteenth Amendment right to due process.

3           **G.  Defendants Ballesteros and Zaragoza**

4           The only allegation against defendant Ballesteros in the second amended complaint is that

5   on October 20, 2022, defendant Ballesteros observed that plaintiff had removed the cervical collar

6   and was standing at his cell door pointing at his neck and requesting wound check on his neck.

7   (Id. at 13.)  The only allegation against defendant Zaragoza in the second amended complaint is

8   that on October 17, 2022, defendant Zaragoza failed to perform prescribed wound care treatment

9   for plaintiff's neck and trapeziums wounds as a result of defendant Kim's instruction.  (Id. at 8.)

10  Defendant Zaragoza wrote, "Dr. Kim notified of patient stating he has gunshot wounds under C-

11  collar; order was not to remove C-collar (unable to provide wound care because of this."  (Id. at

12  8-9.)  In the section of plaintiff's second amended complaint describing plaintiff's legal claims,

13  plaintiff does not name defendants Ballesteros or Zaragoza.  (Id. at 40-49.)  Because plaintiff's

14  second amended complaint fails to identify the legal claims made against defendants Ballesteros

15  and Zaragoza, this Court recommends dismissal of these defendants.

16  **IV.  CONCLUSION**

17          As discussed above, this Court finds that plaintiff's second amended complaint states the

18  following potentially colorable claims:  1) claim one alleging that defendant Kim violated

19  plaintiff's Fourteenth Amendment right to adequate medical care by allegedly a) failing to

20  provide plaintiff with a Philadelphia collar; b) denying plaintiff access to showers and instead

21  ordering bird baths; and c) changing the wound care discharge orders issued by Kaiser

22  Permanente South Hospital; 2) claim one alleging that defendant Gomez violated plaintiff's

23  Fourteenth Amendment right to adequate medical care by denying plaintiff access to showers and

24  instead providing plaintiff with bird baths; 3) claim three alleging that defendant Hailey-Currey

25  violated plaintiff's Fourteenth Amendment right to adequate medical care by forcefully removing

26  plaintiff's cervical collar and incorrectly replacing the cervical collar to plaintiff's neck; 4) claim

27  four alleging that defendants Smith, Mazzanti, Cervetti and Young violated plaintiff's First

28  Amendment right to communicate by restricting outgoing calls by inmates; 5) claim five alleging

1   that defendant Masood violated plaintiff's Fourteenth Amendment right to adequate medical care

2   by a) authorizing plaintiff's premature transfer away from the MHU; and b) by ordering plaintiff

3   to alternate wearing the different C collars, in violation of the aftercare orders issued by Kaiser

4   Permanente South Hospital; and 6) claim eight alleging that defendants Smith, Mazzanti and

5   Melissa retaliated against plaintiff for filing grievances, including the grievance filed against

6   defendant Smith on November 27, 2022, by housing plaintiff in cell 37 on or around December

7   13, 2022.

8          For the reasons discussed above, this Court finds that the following claims raised in the

9   second amended complaint are not potentially colorable: 1) the Monell and state law claims

10  against defendant Sacramento County raised in claims one, three, four, five, six, seven and eight;

11  2) claim five alleging that defendants Akudinobi, Masood, Glaser, Tracy, Reema and Gladys

12  violated plaintiff's Fourteenth Amendment rights by releasing plaintiff early from quarantine;

13  3) claim six alleging that defendants Muring, Kaur, Smith and does 5-8 denied plaintiff wound

14  care in violation of the Fourteenth Amendment; 4) claim six alleging retaliation against defendant

15  Smith; 5) claim six alleging that defendants Cervetti, Yang, Mora, Smith and Barrera retaliated

16  against plaintiff by requesting that plaintiff be medically cleared; 6) claim seven alleging that

17  defendants Smith, Barrera, Young, Cervetti and Mora violated plaintiff's right to exercise;

18  7) claims two and nine raising ADA claims; and 8) all claims against defendants Ballesteros and

19  Zaragoza.

20         Plaintiff has been granted leave to amend once already.  Having reviewed the second

21  amended complaint, this Court finds that plaintiff cannot cure the pleading defects as to those

22  claims found not potentially colorable above.  Accordingly, this Court recommends dismissal

23  without leave to amend of those claims in the second amended complaint that are not potentially

24  colorable.  See Rosati v. Igbinoso, 791 F.3d 1037, 1039 (9th Cir. 2015) (quoting Akhtar v. Mesa,

25  698 F.3d 1202, 1212 (9th Cir. 2012) ("A district court should not dismiss a pro se complaint

26  without leave to amend … unless 'it is absolutely clear that the deficiencies in the complaint

27  could not be cured by amendment.'").  Following the district court's adoption of these findings

28  and recommendations, this Court will provide plaintiff with documents necessary for service of

1    his potentially colorable claims.

2        Accordingly, IT IS HEREBY RECOMMENDED that the following claims raised in the

3    second amended complaint be dismissed without leave to amend: 1) the <u>Monell</u> and state law

4    claims against defendant Sacramento County raised in claims one, three, four, five, six, seven and

5    eight; 2) claim five alleging that defendants Akudinobi, Masood, Glaser, Tracy, Reema and

6    Gladys violated plaintiff's Fourteenth Amendment rights by releasing plaintiff early from

7    quarantine; 3) claim six alleging that defendants Muring, Kaur, Smith and does 5-8 denied

8    plaintiff wound care in violation of the Fourteenth Amendment; 4) claim six alleging retaliation

9    against defendant Smith; 5) claim six alleging that defendants Cervetti, Yang, Mora, Smith and

10   Barrera retaliated against plaintiff by requesting that plaintiff be medically cleared; 6) claim seven

11   alleging that defendants Smith, Barrera, Young, Cervetti and Mora violated plaintiff's right to

12   exercise; 7) claims two and nine raising ADA claims; and 8) all claims against defendants

13   Ballesteros and Zaragoza.

14       These findings and recommendations are submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16   after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties.  Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

19   objections shall be filed and served within fourteen days after service of the objections.  The

20   parties are advised that failure to file objections within the specified time may waive the right to

21   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

22

23   Dated:  February 13, 2025

24

25                              CHI SOO KIM
                           UNITED STATES MAGISTRATE JUDGE

26

27   Sharp2866.ame/2

28

                          34